AIKEN SCHENK HAWKINS & RICCIARDI P.C.
2390 E. Camelback Rd., Suite 400
Phoenix, Arizona 85016
Telephone: (602) 248-8203
Facsimile: (602) 248-8840
E-Mail: ham@aikenschenk.com
E-Mail: prr@aikenschenk.com
Heather A. Macre - 026625
Philip R. Rupprecht - 009288
Attorneys for Debtor

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| PEORIA REGIONAL MEDICAL CENTER, LLC, | Case No. 2:17-bk-11742-SHG |
| Debtor. | **MOTION TO (A) APPROVE THE SALE OF DEBTOR'S REAL PROPERTY, (B) APPROVE THE BIDDING PROCEDURES, INCLUDING THE EXPENSE REIMBURSEMENT, AND (C) TO SCHEDULE AUCTION SALE OF REAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS** |
| Address:     8020 E. Palm Ln.<br>              Mesa, AZ 85207 | |
| Taxpayer ID No(s).: xx-xxx0458 | |

Peoria Regional Medical Center, LLC (the "Debtor"), moves this Court for the entry of an order approving its proposed sale, approving certain procedures, dates and deadlines (the "Bid Procedures"), regarding the sale of the real property and improvements owned by the Debtor located at 26320 N. Lake Pleasant Pkwy., Peoria, Maricopa County, AZ 85345 (APN 201-30-215) and scheduling an auction sale of the property free and clear of liens, claims, and interests, with any liens, claims, and interests to attach to the sale proceeds pursuant to 11 U.S.C. §363. This motion is supported by the following Memorandum of Points and Authorities, which is incorporated by reference herein.

DATED this 17 day of July, 2018.

AIKEN SCHENK HAWKINS & RICCIARDI P.C.

By _Heather Macre_
Heather A. Macre
Philip R. Rupprecht
2390 East Camelback Road, Suite 400
Phoenix, Arizona 85016-3479
Attorneys for Debtor

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

1.    This matter is before the Court on the Debtor's Motion to Approve Sale, Approve Bidding Procedures, and to Schedule an Auction Sale of Real Property Free and Clear of Liens, Claims and Interests (the "Motion"). The Debtor represents that it has the requisite authority to sell its property and therefore seeks, pursuant to the Motion, the entry of an order approving the sale of the property by the Debtor, approving the bidding procedures, and scheduling of an auction sale.

2.    On July 13, 2018, the Debtor entered into a Purchase and Sale Agreement ("PSA") with ADB Investments, L.L.C. and/or its assignee ("Purchaser") and is attached hereto as **Exhibit 1** and incorporated by reference herein for all purposes. The effectiveness of the PSA is expressly conditioned upon this Court's approval.

3.    The Debtor is also seeking an order of this Court scheduling an auction sale hearing in order to solicit any other interested buyers so as to ensure that Purchaser's offer is truly the best.

4.    On October 4, 2017, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. Debtor remains as a Debtor-In-Possession.

5.    As of the Petition Date, the Debtor owned approximately 7.1205 acres of raw land located at 26320 N. Lake Pleasant Pkwy., Peoria, Maricopa County, AZ 85345 (also known generally as APN 201-30-215) and legally described on Exhibit A to the attached PSA (Ex. 1), together with all improvements and as more fully set forth in the PSA (the "Property").

6.    The Debtor wishes to sell the Property as part of its Chapter 11 reorganization and for the past 6 months has explored several offers from interested parties and has engaged in discussions regarding same.

7.    To date, the Purchaser has offered the best and most advantageous terms for the purchase of the Property.

8.    Subject to the ability to receive higher and better offers at an auction, the Debtor desires for this Court to approve the PSA entered into with Purchaser. The Closing Date with the Purchaser for the sale transaction shall be thirty days after the expiration of the Feasibility Period, as defined in the PSA.

2

9.      In connection with the PSA, the Purchaser also seeks the Court's finding in an order approving any sale of the Property to the Purchaser that it is a good faith purchaser entitled to the protections of Bankruptcy Code Section 363(m).

## II.    **THE PROPERTY**

10.      The Property subject to the PSA is the Debtor's real property located at 26320 N. Lake Pleasant Pkwy., Peoria, Maricopa County, AZ 85345 (APN 201-30-215). The relevant and detailed information for the Property is provided in the PSA attached hereto as **Exhibit "A"**. The Property contains a steel structure that has been on-site for several years. It is included in the definition of Property.

11.      The Property is owned by the Debtor. The Debtor approximated the value of the Property as $5,314,900.00 in its Schedules. However, this value was based on the Maricopa County Assessor's full cash value as of 2018. A representative of the Debtor has since met with the Assessor and learned that its calculation may have taken into account the value of the adjacent property or otherwise been inaccurate. In 2019, the Maricopa County Assessor adjusted its full cash value of the Property to $2,759,200.

12.      The Purchaser's offer set forth in the PSA is in accordance with the Assessor's 2019 full cash value and its terms, financial and otherwise, are more favorable than any of the other offers that the Debtor has received. Moreover, Debtor believes that the current offer of $2,805,000.00[1] is indicative of today's market.

13.      The proposed purchase price of the Purchaser will allow the Debtor to pay its real property taxes and secured creditors in full. It will also allow for payments to administrative creditors and will make additional funds available for unsecured creditors. The offer even includes a right of first offer so that once construction is complete the Debtor may lease space for its planned hospital operations. In short, the Purchaser's offer as set forth in the PSA provides the Debtor with a path out of bankruptcy, a way to pay its creditors, and a possible location for future operations.

## III.    **THE DEAL**

---

[1]    $2,805,000.00 is an approximation as the past due real property taxes and the City of Peoria claim are or may be subject to the accrual of interest and/or other charges.

14. The PSA, a copy of which is attached hereto as **Exhibit "A"**, has been entered into between the Debtor and the Purchaser, subject to this Court's approval. The Purchaser is not related to the Debtor. As set forth in the PSA, the purchase price (the "Purchase Price") for the Property shall be in an amount in the aggregate sufficient to satisfy the following:

(a) Two Million Two Hundred Thousand Dollars ($2,200,000.00), in full satisfaction of the first-position lien on the Property held by Fastest Lap, LLC.

(b) Real property taxes (including all penalties and interest) due and owing on the Property through the Closing Date (as set forth in Section 7(c) of the PSA), in the approximate amount of Five Hundred Thousand Dollars ($500,000.00).

(c) City of Peoria's secured claim against the Property in the approximate amount of Five Thousand Dollars ($5,000.00).

(d) Payment in the amount of One Hundred Thousand Dollars ($100,000.000) toward administrative claims and unsecured claims.

(e) A right of first offer to rent some or all of the space in the medical services building that will be constructed on the Property.

15. In addition, the Purchaser has agreed to pay nearly all of the costs associated with the sale, including but not limited to the costs of an owner's title policy.

16. The final Purchase Price shall be calculated by the Escrow Agent as of the Closing Date, and shall be payable as follows:

(a) Fifty Thousand Dollars ($50,000.00) of earnest money shall be deposited by Purchaser into Escrow by wire transfer within two (2) business days following Opening of Escrow (which sum, together with any and all interest earned thereon, shall be referred to as the "Initial Earnest Deposit"). If Purchaser does not terminate the PSA prior to expiration of the Feasibility Period (as defined in Section 9(c) of the PSA), then Purchaser shall deposit into Escrow additional earnest money in the amount of Fifty Thousand Dollars ($50,000.00). The Initial Earnest Deposit and the Additional Earnest Deposit are hereinafter collectively referred to as the "Earnest Money".

(b) The balance of the Purchase Price, less the Earnest Money, shall be deposited by Purchaser into Escrow in cash or by other immediately available funds on or prior to the Closing

Date (as defined in Section 5 of the PSA), subject to closing costs, adjustments and prorations as provided the PSA.

17. The Purchaser will pay cash for this transaction; the PSA is not contingent upon financing. The Debtor and Purchaser mutually agree to indemnify and hold harmless the other of, from and against any real estate commission to any other broker that may be asserted to be payable in connection with the sale of the Property as a result of any action of the Debtor or Purchaser, respectively. Prorations will be made for real and personal property taxes, assessments and other normal and recurring costs and expenses relating to the Property as of the date of the close of escrow.

18. As of the Petition Date, the Property was subject to a secured claim of $2.2 million. In addition, the Debtor owed approximately $429,900.13 in real property taxes to the Maricopa County Treasurer and the CP Buyers. The Debtor also owes the City of Peoria approximately $5,388.79 related to its abatement assessment.

19. The sale proceeds upon closing of the PSA will be sufficient to pay the $2.2 million secured claim held by Fastest Lap, LLC (there are no junior liens on the Property), its successors and/or assigns, the Maricopa County Treasurer, the CP Buyers and the City of Peoria in full. The purchase price will also pay Debtor's administrative claims and provide funds for payments to unsecured creditors.

20. The Closing Date for the sale transaction shall be thirty days after the expiration of the Feasibility Period (as defined in Section 9(c) of the PSA).

IV. **LIEN INTERESTS IN THE PROPERTY**

21. Fastest Lap, LLC claims a first position lien on the Property in the amount of $2.2 million. This secured lien would be an allowed secured claim under the Bankruptcy Code, and it is intended to be paid directly out of the escrow. In fact, Fastest Lap, LLC is privy to the terms of the PSA and supports the proposed sale of the Property on the terms set forth in the PSA. There are no junior liens on the Property.

22. The underlying sale transaction will be free and clear of any and all liens, claims, encumbrances and interests, pursuant to 11 U.S.C. §363 so that the Purchaser will take the Property

free and clear of liens and future disputes. As noted above, Purchaser requires a finding of the Court that it is a good faith purchaser entitled to the protections of Bankruptcy Code Section 363(m). Any liens, claims, and interests will attach to the net sale proceeds and will be paid as set forth above.

23. The sale of the Property by the Debtor is subject to higher and better offers at the time of the Court scheduled auction.

## V. NOTICE OF PROPOSED SALE AND BIDDING PROCEDURES

24. The Debtor has reviewed and considered several proposals and engaged in almost two months of negotiations with the Purchaser. While Debtor believes that the PSA presents the highest and best offer, the sale is subject to higher and better offers at the time of the auction sale hearing ("Auction".)

25. This Motion and the notice of the Motion ("Notice of the Motion") shall be promptly mailed by first class mail by the Debtor to all known creditors, the U.S. Trustee, all taxing authorities known to the Debtor or that have filed proofs of claim, equity holders, members, managers, all parties known by the Debtor to assert a lien upon or hold an interest in the Property, all parties in interest, Purchaser and its counsel, and all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure as of the date of filing of this Motion ("Parties-in-Interest").

26. The Notice of the Motion shall advise the Parties-in-Interest that any and all objections to the Debtor's request to sale the Property and/or Bidding Procedures (as defined below) must be in writing, be filed with the Court and be served on the Debtor five (5) days prior to the hearing scheduled by this Court on the Motion. The Notice of the Motion shall also advise all Parties-in-Interest that if an objection is not received then it shall be deemed implied consent to the approval of all terms and conditions set forth herein, including the Debtor's authorization to sale the Property.

27. The Debtor seeks Court approval of the following procedures for the sale of the Property:

    a. The Debtor requests that the Court schedule a hearing on or around August 6,

6

2018 or as soon thereafter as the Court's calendar may permit to resolve any objections, if any, to the sale of the Property by the Debtor and/or the Bidding Procedures (as defined below); the hearing date will be set forth in the Notice of the Motion.

b.     The Debtor requests that at the hearing on the Motion the Court schedule a date for conducting the Auction; the Debtor requests that the Auction be scheduled approximately 14 days after the hearing on the Motion.

c.     The Debtor requests that the Property be sold without representations, and free and clear of any and all liens, claims, rights, encumbrances and interests (collectively "Interests") in accordance with §§105 and 363 of the Bankruptcy Code, with all valid liens and Interests to attach to the net proceeds from the sale of the Property subject to the above-stated disbursements directly from escrow.

d.     The Purchaser has requested, and the Debtor has agreed, subject to Court approval, of a cost reimbursement of the lesser of $25,000 or the actual amount of Purchaser's out-of-pocket costs and expenses (the "Cost Reimbursement") if Purchaser is not the Successful Bidder (as defined below) following the Auction and the Successful Bidder actually closes on the purchase of the Property. The Cost Reimbursement would be entitled to superpriority administrative expense status pursuant to Sections 503(b) and 507(a) of the Bankruptcy Code and would be paid immediately in cash from closing with the Successful Bidder.

28.     The bidding procedures proposed by the Debtor for the Auction ("Bidding Procedures") are as follows:

(a)     A bid will be considered a qualified bid ("Qualified Bid") and a bidder will be considered a qualified bidder ("Qualified Bidder") only if the bid and bidder (as applicable) satisfy all of the following requirements, with the exception of the Purchaser which is deemed to be a Qualified Bidder:

(b)     A potential bidder must demonstrate to the Debtor a reasonable likelihood of the ability to close on the proposed purchase in a timely manner by providing the Debtor with evidence of the potential bidder's ability to consummate the proposed transaction, with (i) a copy of a bank or other financial statement with a balance sufficient to pay the proposed bid in full or (ii) a

letter of credit, to be submitted to the Debtor's counsel no later than close of business five days prior to the scheduled Auction, in order to participate in the Auction.

(c)     A potential bidder must also submit a "blacklined" or otherwise marked copy of the PSA reflecting the differences between the bidder's proposed purchase and the PSA, exclusive of the purchase price, no later than close of business five (5) days prior to the scheduled Auction.

(d)     A potential bidder must provide for payment of the Property in cash at closing.

(e)     A potential bidder must provide to Debtor a signed writing that the potential bidder's offer is not subject to any conditions precedent to the bidder's ability to enter into a definitive enforceable agreement; all necessary internal and shareholder approvals having been obtained.

(f)     The Debtor will review each potential bid and will determine which bidders are Qualified Bidders and will notify the Qualified Bidders three business days prior to the scheduled Auction and will provide all Qualified Bidders with copies of the PSA and any other Qualified Bid.

(g)     All bidders are encouraged to perform their own due diligence.

(h)     Although each Qualified Bidder will be allowed to participate in the Auction, any non-Qualified Bidder wishing to participate in the Auction will only be allowed to bid upon Bankruptcy Court approval. Upon Court approval, a non-Qualified Bidder will then be determined to be a Qualified Bidder.

(i)     Debtor's counsel will provide prospective bidders with such information as may be reasonably requested which the Debtor and/or their counsel hold in their possession, or which may be obtained by the Debtor.

(j)     There will be no Auction unless there are Qualified Bidders other than the Purchaser. In the event that there is no Auction, the Debtor seeks authorization to consummate the sale of the Property with the Purchaser pursuant to the PSA.

(k)     All Qualified Bidders shall appear in person at the Auction of the Property, or

8

1  through a duly authorized representative.

2          (l)     Each Qualified Bidder participating in the Auction of the Property will
3  confirm at the Auction that it has not engaged in any collusion with any other Qualified Bidder,
4  creditor, or other party in interest regarding the Auction, or any proposed transaction relating to the
5  sale of the Property.

6          (m)    Any potential Successful Bidder, other than the Purchaser, will be required,
7  at the time of the Auction, to provide the Debtor with a $10,000.00 non-refundable deposit, and
8  subject to close on terms substantially similar or better than the Lead Bidder's present offer as set
9  forth in the PSA.

10          (n)     At the Auction, the first bid for the Property, other than the offer of Purchaser
11  (the "Lead Bidder") shall be not less than $2,955,000.00, which is $150,000.00 more than the Lead
12  Bidder. Subsequently, bidding will continue in minimum increments of at least $100,000.00, with
13  the specific increments for each round of bidding to be announced on the record at the Auction
14  unless directed otherwise by the Bankruptcy Court.

15          (o)     All Qualified Bidders shall have the ability to, at any time, request that the
16  Debtor or Court announce, subject to any potential new bids, the current highest or best bid and, to
17  the extent reasonably requested by any bidder, the Debtor or Court will clarify any and all questions
18  such bidder may have regarding the Debtor or Court's announcement of the current bid amount.

19          (p)     The sale of the Property will be subject to higher and better bids at the
20  Auction.

21          (q)     Upon conclusion of bidding, the Auction shall be closed, and the Debtor shall
22  identify and determine in its reasonable business judgment the highest and/or best bid for the
23  Property (the "Successful Bid") and the entity or entities submitting such Successful Bid, (the
24  "Successful Bidder"), and advise the Court and the Qualified Bidders of such determination.

25          (r)     In addition, the Debtor will determine which bid, if any, is the next highest
26  and/or best bid and designate such bid as a "Backup Bid" in the event the Successful Bidder fails to
27  consummate the contemplated transaction. A bidder that submitted a bid that is designated a Backup
28  Bid is a "Backup Bidder." Each Backup Bid shall remain open and binding until the earlier of: (i)

9

two (2) business days after the closing of the transaction(s) by which the Property has been transferred to a bidder pursuant to these Bid Procedures or (ii) fourteen (14) days after the date of the Auction.

(s) The sale of the Property shall be subject to Court approval as evidenced by an order approving the sale of the Property to the Successful Bidder.

## VI. THE LAW.

29. 11 U.S.C. §363(f) allows the debtor in possession to sell property of the estate free and clear of liens, claims and interests if:

(1) applicable non-bankruptcy law permits the sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

30. Under the circumstances, it appears that the sale price of $2,805,000.00?? generates funding with which to satisfy all secured obligations on the Property. Accordingly, the Debtor asks that the sale be free and clear of any and all liens, claims, encumbrances and interests so that the Purchaser may receive the Property free of future disputes and claims.

31. The proposed Cost Reimbursement to the Purchaser should be approved because it is in the best interest of the estate and will not unduly burden the Debtor's estate. *In re America West Airlines, Inc.* 166 B.R. 908, 912 (Bankr. D. Ariz. 1994); *In re Hupp Industries, Inc.*, 140,191(Bankr. N. D. Ohio 1992). Purchaser has already conducted some due diligence in connection with the PSA and work still must be done before the Auction of the Property. The offer of the Purchaser has paved the way for a plan of reorganization of the Debtor and may bring additional Qualified Bidders to the Auction. The Debtor has no prior relationship with the Purchaser and its negotiations have been arms-length. Based upon its exploration of the real estate market in search of potential purchasers, the Debtor believes that having the PSA will maximize the proceeds from the sale of the

Property by encouraging other potential bidders to bid at the Auction. Under the circumstances, the amount of the Cost Reimbursement is appropriate and should be approved.

32. The Debtor further requests that the Court waive the stay provisions of Bankruptcy Rule 6004(h). The dates and deadlines proposed for providing Notice of this Motion and of the opportunity to object to the sale of the Property and the Bidding Procedures, and the ultimate sale of the Property provide sufficient notice and protections to all parties- in-interest such that the 14 day stay is not necessary.

WHEREFORE, the Debtor requests the entry of an order:

1. Approving the Debtor's sale of the Property to take place consistent with the terms and conditions of this Motion;

2. Approving the Bidding Procedures;

3. Scheduling of the Auction for the sale of the Property to determine the highest and best offer for the Property;

4. Authorizing the Debtor to close with the Purchaser under the terms of the PSA in the event that there is no Auction;

5. Finding that the Purchaser is a "good faith" purchaser of the Property within Section 363 (m) of the Bankruptcy Code;

6. Approving the Cost Reimbursement to the Purchaser on the terms set forth herein;

7. Waiving the 14 day stay requirements of Bankruptcy Rule 6004(h); and

8. Granting such further relief as the Court deems appropriate and just.

DATED this 17 day of July, 2018.

AIKEN SCHENK HAWKINS & RICCIARDI P.C.

By _Heather Macre_
Heather A. Macre
Philip R. Rupprecht
2390 East Camelback Road, Suite 400
Phoenix, Arizona 85016-3479
Attorneys for Debtor

COPY of the foregoing mailed, or served
via electronic notification* or fax** if so marked,
this _17th_ day of July, 2018, to:

U.S. TRUSTEE'S OFFICE * ustpregion14.px.ecf@usdoj.gov
Renee Sandler Shamblin* Renee.S.Shamblin@usdoj.gov
230 N. First Ave., Ste. 204
Phoenix, AZ 85003-1706

Peter Muthig* muthigk@mcao.maricopa.gov
Maricopa County Attorney's Office
Civil Services Division
Security Center Building
222 North Central Avenue, Suite 1100
Phoenix, AZ 85004
*Attorney for Maricopa County Treasurer*

David H. Benton* david.benton@peoriaaz.gov; caofiling@peoriaaz.gov
Office of the City Attorney, City of Peoria
8401 West Monroe Street, Room 280
Peoria, Arizona 85345
*Attorneys for City of Peoria*

Daren R. Brinkman* Firm@Brinkmanlaw.com
Brinkman Portillo Ronk, APC
4333 Park Terrace, #205
Westlake Village, CA 91361
*Attorneys for David Gottlieb, Creditor Trustee*
*of the Gilbert Hospital Unsecured Creditor Trust*

Bill McCalmont* bill@firstaztitle.com
First Arizona Title Agency
6263 N. Scottsdale Road, Suite 190
Scottsdale, AZ 85250
*Title Company*

ADB Investments, L.L.C.
Attn: David T. Reesor* davidreesor@photoadb.com
11388 E. Appaloosa Place
Scottsdale, AZ 85259
*Purchaser*

David Wm. Engelman* dwe@eblawyers.com
Tamalyn E. Lewis* tel@eblawyers.com
Engelman Berger, P.C.
3636 N. Central Ave., Suite 700
Phoenix, AZ 85012
*Attorneys for the Purchaser*

_Sonia Rose_

12

# EXHIBIT 1

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (the "**Agreement**") is entered into as of July 13, 2018 (the "Effective Date") by and between **ADB INVESTMENTS, L.L.C.**, an Arizona limited liability company ("**Buyer**"), and **PEORIA REGIONAL MEDICAL CENTER, L.L.C.**, an Arizona limited liability company ("**Seller**"), on the following terms and conditions:

     **1.**   <u>Agreement</u>.  Subject to all of the terms and conditions of this Agreement, Seller agrees to sell, transfer and convey to Buyer, and Buyer agrees to purchase and acquire from Seller, the real property consisting of approximately 7.1205 acres of land located at 26320 North Lake Pleasant Parkway, Peoria, Arizona, also known generally as APN 201-30-215, and legally described on <u>Exhibit A</u> attached hereto, together with (i) all buildings, structures, fixtures and improvements located thereon; (ii) all appurtenances, hereditaments, easements, rights-of-way, reversions, remainders, development rights, well rights, water rights and air rights; (iii) all oil, gas, and mineral rights not previously reserved; (iv) any rights of Seller to any adjoining strips or gores of property and any land lying within the bed of any adjoining street; (v) all licenses, permits, entitlements, subdivision agreements, development agreements and other agreements relating to or benefitting such real property; (vi) all plats, plans, specifications, maps, drawings and other renderings relating to or benefitting such real property; (vii) all reports, studies, contracts, warranties and any similar rights relating to or benefiting such real property; (viii) all intangible rights, goodwill and similar rights relating to or benefiting such real property (including any trade names, trademarks and other intellectual property related to such property and the operation and marketing thereof); (ix) all development rights, permits, approvals and privileges relating to or benefiting such real property; (x) all rights, claims and awards relating to or benefiting such real property; (xi) all rights to receive a reimbursement, credit or refund from any applicable agency or entity of any deposits or fees paid in connection with the development of such real property; and (xii) any other rights or privileges appurtenant to such real property or used in connection therewith (collectively, the "**Property**").

     Seller is operating as debtor-in-possession in Chapter 11 proceedings in the United State Bankruptcy Court for the District of Arizona, Case No. 2:17-bk-11742-SHG (the "**PRMC Bankruptcy**").  Buyer's obligations under this Agreement are expressly conditioned upon the issuance by the court in the PRMC Bankruptcy (the "**Bankruptcy Court**") of an order pursuant to 11 U.S.C. Section 363 authorizing the sale of the Property to Buyer, free and clear of all liens, claims and encumbrances, pursuant to this Agreement ("**Sale Order**"), and such order having become final and nonappealable (such date hereinafter referred to as the "**Approval Date**").

     **2.**   <u>Escrow Agent</u>.  Seller and Buyer shall open an escrow ("**Escrow**") with First Arizona Title Agency ("**Escrow Agent**") to facilitate the consummation of the sale of the Property pursuant to the terms of this Agreement.  Escrow Agent shall immediately notify the parties when it has received the Agreement executed by Buyer and Seller.  This Agreement shall also constitute escrow instructions to Escrow Agent from Seller and Buyer as to matters set forth herein pertaining to Escrow Agent.

     **3.**   <u>Purchase Price and Payment Terms</u>.

        **(a)**   The purchase price (the "**Purchase Price**") to be paid by Buyer for the Property shall be in an amount in the aggregate sufficient to satisfy the following:

**(i)** Two Million Two Hundred Thousand Dollars ($2,200,000.00), in satisfaction of the first-position lien on the Property held by Fastest Lap, LLC.

**(ii)** Real property taxes (including all penalties and interest) and improvement liens and special assessments due and owing on the Property through the Closing Date (as set forth in Section 7(c) below), in the approximate amount of Five Hundred Thousand Dollars ($500,000.00).

**(iii)** City of Peoria's secured claim against the Property in the approximate amount of Five Thousand Dollars ($5,000.00).

**(iv)** Payment in the amount of One Hundred Thousand Dollars ($100,000.000) toward administrative claims and unsecured claims in the PRMC Bankruptcy.

**(b)** The final Purchase Price shall be calculated by Escrow Agent as of the Closing Date, and shall be payable as follows:

**(i)** Fifty Thousand Dollars ($50,000.00) of earnest money shall be deposited by Buyer into Escrow by wire transfer within two (2) business days following Opening of Escrow (which sum, together with any and all interest earned thereon, shall be referred to as the "**Initial Earnest Deposit**"). If Buyer does not terminate this Agreement prior to expiration of the Feasibility Period (as defined in Section 9(c) below), then Buyer shall deposit into Escrow additional earnest money in the amount of Fifty Thousand Dollars ($50,000.00). The Initial Earnest Deposit and the Additional Earnest Deposit are hereinafter collectively referred to as the "**Earnest Money**."

**(ii)** The balance of the Purchase Price, less the Earnest Money, shall be deposited by Buyer into Escrow in cash or by other immediately available funds on or prior to the Closing Date (as defined in Section 5 below), subject to closing costs, adjustments and prorations as provided herein.

**4.** Earnest Money. The Earnest Money shall be held in a federally-insured, interest-bearing account. The Earnest Money shall apply as a credit toward payment of the Purchase Price at Close of Escrow. If this Agreement is terminated prior to the expiration of the Feasibility Period, the Earnest Money shall be refunded to Buyer. If this Agreement is terminated after the expiration of the Feasibility Period, the Earnest Money shall be nonrefundable to Buyer and shall be paid to Seller unless the termination is pursuant to a provision of this Agreement expressly providing for the refund of the Earnest Money to Buyer.

**5.** Escrow Opening and Closing. The opening of escrow (the "**Opening of Escrow**") shall occur when, following the Approval Date, Escrow Agent receives a fully executed counterpart of this Agreement signed by Buyer and Seller. Escrow Agent shall sign and date this Agreement on the space provided at the end of this Agreement, indicating that Escrow has been opened as of such date. The date set for conveyance of title to the Property and the performance of all conditions (except those conditions expressly required to be performed earlier pursuant to this Agreement) relating thereto ("**Closing**" or "**Closing Date**" or "**Close of Escrow**") shall be thirty (30) days after expiration of the Feasibility Period.

**6.** Termination.

(a) Termination by Buyer. Buyer, upon written notice to Seller, may terminate the Agreement upon the occurrence of any of the following events:

i. If Seller does not file a motion seeking Bankruptcy Court approval of (1) the sale of the Property to Buyer pursuant to the terms of this Agreement and (2) certain bidding procedures (the "**Sale and Bidding Procedures Motion**") in the PRMC Bankruptcy within fifteen (15) days from the Effective Date of the Agreement;

ii. If the Sale and Bidding Procedures Motion shall not have been approved[1] (the "**Sale and Bidding Procedures Approval**") entered by the Bankruptcy Court within forty-five (45) days from the filing of the Sale and Bidding Procedures Motion; provided, however, that this Agreement may not be terminated pursuant to this section in the event that Seller timely filed the Sale and Bidding Procedures Motion and the Bankruptcy Court's calendar is the reason that the entry of the Sale and Bidding Procedures Approval has not occurred on or before such date;

iii. If an auction to sell the Property to the highest and best offer (the "**Auction**") is not conducted by the Bankruptcy Court within twenty-five (25) days from the Sale and Bidding Procedures Approval; provided, however, that this Agreement may not be terminated pursuant to this section in the event that Seller timely filed the Sale and Bidding Procedures Motion and the Bankruptcy Court's calendar is the reason that the Auction has not occurred on or before such date;

iv. If the Sale Order is not entered in the PRMC Bankruptcy within ten (10) days of the completion of the Auction; provided, however, that this Agreement may not be terminated pursuant to this section in the event that Seller timely filed the Sale and Bidding Procedures Motion and the Bankruptcy Court is the reason that the Sale Order has not been entered on or before such date;

v. Prior to entry of the Sale Order if the Bankruptcy Court enters an order approving an alternative disposition of the Property or Buyer is not the successful bidder at the Auction;

vi. At any time following entry of the Sale and Bidding Procedures Order, but prior to entry of the Sale Order, upon or following the date that an order of any court of competent jurisdiction shall be entered (i) vacating or reversing the Sale or Bidding Procedures Order or (ii) amending, supplementing, or otherwise modifying the Sale or Bidding Procedures Order and Buyer does not consent to the amendment, supplement, or modification; or

vii. If the PRMC Bankruptcy is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates and approves of the transactions provided for in this Agreement.

---

[1] The term "approved" shall mean that the Bankruptcy Court has heard, adjudicated and approved the Sale and Bidding Procedures Motion, including resolving any objections thereto, but not entered a formal order.

**(b)** <u>Termination by Seller</u>.  Seller, upon written notice to Buyer, may terminate the Agreement upon the occurrence of any of the following events:

       i.      Prior to entry of the Sale Order if the Bankruptcy Court enters an order approving an alternative disposition of the Property or Buyer is not the successful bidder at the Auction.

       ii.      If Buyer fails to deposit Fifty Thousand Dollars ($50,000.00) of earnest into Escrow by wire transfer within two (2) business days following Opening of Escrow.

       iii.      If Buyer fails to deposit into Escrow additional earnest money in the amount of Fifty Thousand Dollars ($50,000.00) at the expiration of the Feasibility period.

       iv.      If Buyer fails to pay the Purchase Price as agreed in Section 3.

       v.      If Buyer fails to proceed with Closing as agreed herein.

       vi.      If the Bankruptcy Court refuses to allow the sale of the Property to the Buyer.

       vii.      If Buyer fails to fulfill any of its obligations under this Agreement.

**(c)** <u>Termination Effect</u>.  Upon any termination by either of the parties hereto as expressly allowed under this Agreement (including, without limitation, any deemed termination), (a) the Earnest Money, if deposited, shall be delivered to the party that this Agreement specifies is entitled thereto, (b) all other documents, instruments, and funds delivered into Escrow shall be returned to the party that delivered the same into Escrow, (c) Buyer shall promptly perform all of Buyer's obligations under <u>Sections 9(a)</u> and <u>9(b)</u> below, and (d) the parties shall thereafter be relieved from any further obligations hereunder, except with respect to any obligations under this Agreement that are expressly stated to survive any termination of this Agreement.

    **7.**    <u>Owner's Title Policy; Closing Costs</u>.

**(d)** <u>Title Insurance Costs</u>.  At Close of Escrow, Escrow Agent shall furnish to Buyer an ALTA (Form 2006) extended coverage owner's policy of title insurance ("**Title Policy**") in the amount of the Purchase Price insuring Buyer's title to the Property, subject only to the usual printed exceptions contained in such title insurance policies and the Permitted Exceptions (as defined in <u>Section 8(b)</u> below), together with such endorsements that Buyer may request. Buyer shall pay the premium for the Title Policy and any charges for any endorsements requested by Buyer.

**(e)** <u>Recording and Escrow Fees</u>.  At Closing, Buyer shall pay all recording fees, Escrow fees and other customary fees or charges.

**(f)** <u>Proration of Taxes</u>.  All real estate taxes and assessments on the Property shall be prorated between Buyer and Seller as of the Closing Date based on the latest available figures.  All improvement liens and special assessments shall be paid in full by Buyer (as part of the Purchase Price) at the Closing.  The obligations under this Section shall survive the Closing and the delivery and recordation of the Deed.

**8.** <u>Status of Title</u>.

       **(a)**   <u>Survey</u>. As part of the Property Documents (as defined in <u>Section 9(a)</u> below), Seller shall provide Buyer with copies of all surveys of the Property (or any portion thereof) in Seller's possession or control. Buyer, at its sole cost and expense, may cause a new survey (the "**Survey**") of the Property to be prepared by a registered land surveyor or licensed civil engineer. The Survey shall be in accordance with the 2016 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys and shall be certified to Buyer, Seller and Escrow Agent. Buyer shall promptly provide a copy of the Survey to Seller upon receipt.

       **(b)**   <u>Title Commitment</u>. Within five (5) days after Opening of Escrow, Escrow Agent shall issue and deliver to Buyer (collectively, the "**Title Commitment**"): (i) a current commitment for an ALTA extended coverage owner's policy of title insurance for the Property, and (ii) copies of all documents referenced as exceptions therein. Buyer shall have thirty (30) days after receipt of the Title Commitment (but not less than ten (10) days after receipt of any amendment to the Title Commitment identifying any new matters, including Survey matters) which Buyer did not have prior actual knowledge of and which were not caused by Buyer), to object in writing to Seller to any matters shown thereon (a "**Buyer's Objection Letter**"). Any matters shown in the Title Commitment which are not timely objected to by Buyer shall be deemed approved by Buyer and shall be "**Permitted Exceptions**". Seller shall have no obligation to cure or correct any matter objected to by Buyer, except as otherwise provided in subsection (c) below. On or before five (5) business days following Seller's receipt of Buyer's Objection Letter, Seller may elect, by delivering written notice of such election to Buyer and Escrow Agent ("**Seller's Response**") whether to cause Escrow Agent to remove or insure over any matters objected to in Buyer's Objection Letter. If Seller fails to deliver Seller's Response within the time frame set forth above, it shall be deemed to be an election by Seller not to cause Escrow Agent to so remove or insure over such objections. If Seller elects not to cause Escrow Agent to so remove or insure, then Buyer must elect, by delivering written notice of such election to Seller and Escrow Agent on or before the earlier to occur of (1) five (5) business days following Buyer's receipt of Seller's Response, or (2) if no Seller's Response is received by Buyer, five (5) business days following the date on which Seller shall have been deemed to have responded, as provided above, to: (i) terminate this Agreement (in which event the Earnest Money shall be refunded to Buyer and the provisions of <u>Section 6</u> shall apply); or (ii) proceed with this transaction in which event such objected to exceptions or matters shall be deemed approved by Buyer and become a Permitted Exception(s). In the event that Buyer fails to make such election on a timely basis, then Buyer shall be deemed to have elected to terminate this Agreement in accordance with the preceding clause (i). Seller shall deliver possession of the Property at the Closing free and clear of all matters except the Permitted Exceptions.

       **(c)**   <u>Unpermitted Exceptions</u>. Notwithstanding anything to the contrary contained in this Agreement, at or before the Closing, and without the need for Buyer to object to the same in Buyer's Objection Letter, Seller shall remove all financing encumbrances arising from any deeds of trust, mortgages or other liens encumbering the Property (expressly excluding the lien for current taxes and assessments that are not yet due and payable); mechanics', materialmen's and supplier's liens; judgment liens; federal or state income or sales tax liens; and lis pendens; and Seller shall terminate all leases, possessory agreements, licenses and operating agreements which affect the Property, all without cost to Buyer. Seller agrees to execute and deliver to Escrow Agent on or prior to the Closing Date, an owner's

affidavit, in a form reasonably acceptable to Escrow Agent, so that the Title Policy contains no exceptions for parties in possession or mechanics' or materialmens' liens.

**(d)** <u>Covenant Not to Convey</u>. Except as expressly contemplated herein, Seller shall not sell, convey, assign, lease or otherwise transfer all or any part of the Property or any interest therein, without the prior written consent of Buyer, which consent may be withheld in Buyer's sole discretion.

9.  <u>Feasibility</u>.

**(a)** <u>Property Documents</u>. No later than two (2) business days following the Opening of Escrow, Seller shall provide Buyer with copies of all reports, surveys, studies, environmental surveys, studies or reports, contracts, agreements, documents, approvals, drawings, plats, plans, specifications, filings, legal notices or similar writings pertaining to the Property or to the development of which the Property is a part, including the physical condition of the Property or the development thereof, in Seller's possession or control (collectively, the "**Property Documents**"). Buyer acknowledges and agrees that the Property Documents will be furnished without any representation or warranty from Seller, except as otherwise expressly provided for herein. Any such Property Documents not in Seller's possession or control concurrently with the execution hereof but which come into Seller's possession or control prior to Close of Escrow shall be delivered immediately to Buyer. If this Agreement is terminated for any reason, Buyer shall return the Property Documents to Seller. Seller shall cooperate with Buyer, at no out-of-pocket cost to Seller, (i) to cause any of the Property Documents to be updated and recertified to Buyer, (ii) to obtain reliance letters from any of the preparers of the Property Documents, and (iii) to obtain any consents that may be required so that Buyer may receive the benefits of any agreements comprising the Property Documents.

**(b)** <u>Due Diligence Tests</u>. At all reasonable times from the Opening of Escrow until the Closing Date, Buyer, its agents and representatives shall be entitled at Buyer's sole cost and expense to: (i) enter onto the Property to perform any reasonable inspections, investigations, studies and tests of the Property (including, without limitation, physical, engineering, soils, geotechnical and environmental tests); (ii) review the Property Documents; and (iii) investigate such other matters pertaining to the Property as Buyer may desire. Buyer's entry onto and inspections of the Property in accordance with the terms hereof shall not unreasonably interfere with the current use of, or damage, the Property in any respect, and any entry by Buyer onto the Property shall be subject to, and conducted in accordance with, all applicable laws. Buyer shall indemnify, protect, defend and hold Seller (and its officers, directors, employees and representatives) harmless from and against any and all claims (including, without limitation, claims for mechanic's liens or materialmen's liens), causes of action, demands, obligations, losses, damages, liabilities, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees) (collectively, "**Claims**") in connection with or arising out of any inspections carried on by or on behalf of Buyer pursuant to the terms hereof; provided, however, Buyer shall not indemnify Seller for any Claims caused by Seller's acts or omissions, and Buyer shall have no liability for the discovery of pre-existing conditions (e.g. Buyer shall not be responsible for remediating environmental contamination discovered by Buyer). Upon receipt of a written report of the results of each of such inspections, studies, tests, and assessments, Buyer shall immediately deliver a complete copy thereof to Seller, together with any amendments or modifications, and Seller may retain such copies, at no cost, for its own use in the event this Escrow does not Close, all without any representation or warranty

whatsoever from Buyer regarding the accuracy, sufficiency or completeness thereof. In the event that this Agreement is terminated for any reason other than Seller default, Buyer shall repair any damage to the Property caused by its entry thereon and restore the same to substantially the same condition in which it existed prior to such entry. The provisions of this sub-Section shall survive the Closing or the earlier termination of this Agreement.

Buyer shall carry (or cause those of Buyer's agents or consultants who go upon the Property) to carry commercial general liability insurance covering Buyer's activities on and about the Property, with a limit of not less than $1,000,000.00 combined single limit per occurrence, against claims for personal injury liability including, without limitation, bodily injury, death or property damage liability and covering Buyer and (A) operations of independent contractors engaged by Buyer for services or construction on or about the Property, and (B) contractual liability, which shall name Seller as an additional insured. Prior to Buyer's or its agents' entry on the Property, Buyer shall provide Seller with a copy of such insurance policy or a certificate evidencing the same, and such insurance shall include a clause that the insurer will provide Seller with at least thirty (30) days' prior written notice of any material change, non-renewal or cancellation of the policy. Such insurance policy shall be obtained from an insurance company authorized to do business in the State in which the Property is located and rated not less than Best's Financial Class X and Best's Policy Holder Rating "A". In addition, any insurance policy obtained by Buyer shall be written as a primary policy, and shall not be contributing with or in excess of any coverage which Seller may carry. The liability limits of the above-described insurance policies shall in no manner limit the liability of Buyer under the terms of this Subsection.

     **(c)**   <u>Termination Right</u>. Buyer shall have the right at any time from the Opening of Escrow until 5:00 p.m. on the date which is sixty (60) days following Opening of Escrow (the "**Feasibility Period**") to terminate this Agreement by delivering a written notice of such termination to Seller and Escrow Agent if Buyer determines in its sole and absolute discretion that the Property is not acceptable to Buyer for any reason. If Buyer fails to deliver a written notice to Seller and Escrow Agent approving the feasibility of acquiring the Property ("**Approval Notice**") on or before the expiration of the Feasibility Period, then this Agreement and the Escrow shall automatically terminate. In the event this Agreement is terminated (or is deemed to have terminated) in accordance with this Section, then Escrow Agent shall refund the Earnest Money to Buyer and the provisions of <u>Section 6</u> shall apply.

     **10.**   <u>Conditions to Closing</u>. The obligation of Buyer to complete the transaction contemplated by this Agreement is subject to the following conditions precedent (the "**Buyer's Closing Conditions**"), which conditions may be waived, or the time for satisfaction thereof extended, by Buyer only in a writing executed by Buyer:

     **(a)**   <u>Title</u>. Escrow Agent shall be prepared and irrevocably committed to issue to Buyer (with an effective date not earlier than the Closing Date), an ALTA Extended Owner's Policy of Title Insurance (Form 2006) in favor of Buyer for the Property: (i) showing fee title to the Property vested in Buyer, (ii) with liability coverage in an amount equal to the Purchase Price, (iii) with those endorsements requested by Buyer, and (iv) containing no exceptions other than the Permitted Exceptions.

     **(b)**   <u>Seller's Due Performance</u>. All of the representations and warranties of Seller set forth in this Agreement shall be true, correct and complete in all material respects as

of the Closing Date, and Seller, on or prior to the Closing Date, shall have complied with and/or performed all of the obligations, covenants and agreements required on the part of Seller to be complied with or performed pursuant to the terms of this Agreement.

       **(c)**    <u>Possession</u>. All lessees, tenants and occupants of the Property, if any, must have vacated the Property so that the sole and exclusive possession of the Property can be provided to Buyer at the Closing.

       **(d)**    <u>Sale Motion</u>.  Seller shall cause to be filed in the PRMC Bankruptcy a motion to sell the Property and establish bidding procedures, which, together with the Sale Order, shall be approved by Buyer.

       **(e)**    <u>Sale Order</u>.  The Sale Order is final and nonappealable.

If all of the Buyer's Closing Conditions are not satisfied by the Closing Date, then Buyer may elect to: (1) terminate this Agreement, in which event the Earnest Money shall be refunded to Buyer and the provisions of <u>Section 6</u> shall apply or (2) waive the unsatisfied Buyer's Closing Condition and proceed to Closing in accordance with this Agreement.  To the extent that the failure of any applicable Buyer's Closing Condition is caused by a Seller default, Buyer shall be entitled to pursue its rights and remedies pursuant to the terms of <u>Section 12(a)</u>.

    **11.**    <u>Conveyance</u>.

       **(a)**    <u>Deed; Affidavit of Value</u>.  The Property shall be conveyed to Buyer, upon Close of Escrow, by special warranty deed (the "**Deed**"), in the form attached hereto as <u>Exhibit B</u>.  The Deed shall be deposited with Escrow Agent on or before the Close of Escrow and shall be recorded at the Close of Escrow.  Seller and Buyer hereby authorize and direct Escrow Agent to execute on behalf of Seller and Buyer the Affidavit of Value required by Arizona law to be provided to the County Recorder in order to record the Deed.

       **(b)**    <u>Assignment and Bill of Sale</u>.  On or before the Closing, Seller shall execute and deliver to Escrow Agent an Assignment and Bill of Sale in the form attached hereto as <u>Exhibit C</u> and Escrow Agent shall deliver the original of the Assignment and Bill of Sale to Buyer promptly following the Closing.

       **(c)**    <u>Non-Foreign Affidavit</u>. Seller shall execute and deliver to Escrow Agent on or before the Closing Date the non-foreign affidavit required pursuant to <u>Section 28</u> of this Agreement.  Escrow Agent shall provide the fully signed original of the Non-Foreign Affidavit to Buyer promptly following the Closing.

       **(d)**    <u>Right of First Offer</u>.  Buyer shall execute and deliver to Seller at Closing the Right of First Offer in the form attached hereto as <u>Exhibit D</u>, pursuant to which Buyer grants Seller a right of first offer to lease, at prevailing market terms, space in the hospital facility to be developed on the Property.

       **(e)**    <u>Other Documents</u>.  Each party shall, whenever and as often as it shall be requested by the other party, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such further instruments and documents, including supplemental escrow instructions, as may be necessary in order to complete the sale, conveyance and transfer herein provided and to do any and all things as may be requested in order to carry out

the intent and purpose of this Agreement; provided, such instruments or actions shall not increase or expand the parties' respective obligations or liabilities beyond those that are contemplated by this Agreement.

12. Remedies.

(a) Default by Seller. If Seller shall breach any of the terms or provisions of this Agreement, and such breach continues for five (5) business days after Buyer provides Seller with written notice thereof, then Seller shall be in default and Buyer may, as its sole and exclusive remedies: (i) waive the effect of such matter and proceed to consummate this transaction; (ii) terminate this Agreement by giving written notice of termination to Seller and Escrow Agent, receive a full refund of the Earnest Money, and recover from Seller all of Buyer's actual out-of-pocket expenses incurred in connection with the negotiation and performance of this Agreement, following which event the provisions of Section 6 shall apply; or (iii) pursue an action to compel specific performance of Seller's obligations hereunder, provided that any such action must be commenced by Buyer within ninety (90) days following the expiration of any applicable cure period for the default by Seller. Nothing contained in this Section shall limit or prevent Buyer from enforcing Seller's obligations and liabilities which survive a termination of this Agreement.

(b) Default by Buyer. If Buyer shall breach any of the terms or provisions of this Agreement, and such breach continues for five (5) business days after Seller provides Buyer with written notice thereof, then Buyer shall be in default and Seller may waive such default, or Seller may, as its exclusive remedy, immediately terminate this Agreement, in which event Seller may receive the Earnest Money as liquidated damages and as consideration for the acceptance of this Agreement and for taking the Property off the market, and not as a penalty, and the provisions of Section 6 shall apply. Buyer and Seller have determined and hereby agree that it would be impractical or extremely difficult, if not impossible, to ascertain with any degree of certainty the amount of damages which would be suffered by Seller if Buyer fails to purchase the Property in accordance with the provisions of this Agreement, and the parties agree that a reasonable estimate of such damages under the circumstances is an amount equal to the Earnest Money. All other remedies, including without limitation, the remedy of specific performance shall be unavailable to Seller; provided, however, upon any such termination, Buyer shall deliver to Seller the Buyer Documents described in Section 6. Nothing contained in this Section shall limit or prevent Seller from enforcing Buyer's obligations and liabilities which survive a termination of this Agreement.

(c) Post-Closing Defaults. Each party shall have all rights and remedies for defaults occurring or discovered after the Closing if the defaulting party fails to cure within ten (10) days after receipt of written notice.

13. Brokers. Buyer and Seller mutually agree to indemnify and hold harmless the other of, from and against any real estate commission to any other broker that may be asserted to be payable in connection with the sale of the Property as a result of any action of Buyer or Seller, respectively. The indemnity provided in this Section shall survive Close of Escrow or earlier termination of this Agreement.

14. Seller's Representations, Warranties and Additional Covenants. Seller hereby represents, warrants and covenants (with the understanding that Buyer is relying on said

representations, warranties and covenants) that:

    **(a)**    Seller is a limited liability limited company duly organized and validly existing under the laws of the State of Arizona and is in good standing and authorized to transact business in the State of Arizona.

    **(b)**    Seller has full right, power and authority to sell the Property to Buyer as provided in this Agreement and to carry out its obligations hereunder. The individual(s) executing this Agreement and the instruments referenced herein on behalf of Seller have the legal power, right and actual authority to bind Seller to the terms hereof and thereof. This Agreement is, and all other instruments, documents and agreements to be executed and delivered by Seller in connection with this Agreement shall be, duly authorized, executed and delivered by Seller and shall be valid, binding and enforceable obligations of Seller.

    **(c)**    Seller has not received written notice, and otherwise has no actual knowledge of any (i) claims, actions, investigations, suits or proceedings pending or threatened that affect the Property, or the ownership, zoning, use or operation thereof, except as disclosed in the Property Documents, (ii) judgments, orders, awards or decrees currently in effect against Seller with respect to the ownership or operation of the Property, (iii) existing violations of any law, statute, government regulation or requirement concerning the Property; or (iv) special assessment proceedings affecting the Property.

    **(d)**    There are no leases, occupancy agreements, easements, licenses or other agreements which grant third parties any possessory or usage rights to all or any part of the Property.

    **(e)**    The execution, delivery and performance by Seller of this Agreement and such other instruments and documents to be executed and delivered in connection herewith by Seller does not, and shall not, result in any violation of, or conflict with, or constitute a default under, any provisions of any agreement of Seller or any mortgage, deed of trust, indenture, lease, security agreement or other instrument, covenant, obligation or agreement to which Seller or the Property is subject, or any judgment, law, writ, decree, order, injunction, rule, ordinance or governmental regulation or requirement affecting Seller or the Property.

    **(f)**    To Seller's actual knowledge, without any independent inquiry or investigation, and except as may be disclosed in the Property Documents: (i) the Property is not nor has it ever been in violation, nor is it currently under investigation for violation of any federal, state or local law, ordinance or regulation relating to industrial hygiene, worker health and safety, or to the environmental conditions in, at, on or under or about the Property, including, but not limited to, soil and groundwater conditions ("**Environmental Laws**"); (ii) the Property has not been subject to a deposit of any Hazardous Substance (as defined below); (iii) neither Seller nor any third party has used, generated, manufactured, stored or disposed in, at, on or under the Property any Hazardous Substance; and (iv) there is not now in, on or under the Property any underground or above ground storage tanks or surface impoundments, any asbestos containing materials or any polychlorinated biphenyls used in hydraulic oils, electrical transformers or other equipment. For purpose of this Agreement, the term "**Hazardous Substance**" shall be deemed to include any wastes, materials, substances, pollutants and other matters regulated by Environmental Laws.

**(g)** Except as disclosed in the Title Commitment, (i) Seller has not entered into any agreement with governmental authorities, any adjoining or surrounding property owners, any civil association, homeowner association, utility, any school board, church or other religious body, or any other person or entity that would in any manner be binding upon Buyer or upon the Property from and after the Closing; (ii) there are no shared expense agreements, reimbursement agreements or development payback agreements that will affect all or any portion of the Property after Closing; and (iii) here are no endangered species or governmentally protected natural habitat, flora or fauna on the Property nor are there any areas on or near the Property that are designated as wetlands or otherwise subject to the United States Army Corps of Engineers' Section 404 permit requirements.

**(h)** Seller is the owner of fee simple interest to the Property and, other than the liens referenced in Section 3(a) above, and to Seller's actual knowledge, without any independent inquiry or investigation, there are no other monetary encumbrances on the Property.

**(i)** Seller shall deliver to Buyer written notice of any written notice or information relating to the Property received by Seller from any and all governmental or quasi-governmental authorities or entities after Opening of Escrow within the earlier of (i) five (5) business days after receipt thereof by Seller or (ii) the Closing Date.

The foregoing representations, warranties and covenants shall be true as of the date hereof and as of Close of Escrow and shall survive the Close of Escrow and delivery of the Deed for a period of two (2) years. If at any time prior to Closing Buyer or Seller discovers that any of such warranties or representations is untrue then the party discovering such untrue representation or warranty shall notify the other in writing of such discovery, in which event such warranty or representation shall be deemed modified to the extent described in such notice; provided, however, if any such warranty or representation is found to be untrue prior to Closing, then, notwithstanding any other provision of this Agreement, Buyer shall have fifteen (15) days after learning of such untrue warranty or representation to notify Seller in writing of Buyer's election to either (i) waive the truthfulness of any such untrue warranty or representation and complete the Closing; or (ii) elect one of the remedies set forth in Section 12(a) above. If such discovery is made after the Closing, Buyer may seek to recover its actual damages, as its sole and exclusive remedy.

**15.** Buyer's Representations, Warranties and Additional Covenants. Buyer hereby represents, warrants and covenants that:

**(a)** Buyer is a limited liability company duly organized and validly existing under the laws of the State of Arizona and is in good standing and authorized to transact business in the State of Arizona.

**(b)** Buyer has full right, power and authority to purchase the Property from Seller as provided in this Agreement and to carry out its obligations hereunder. The individual(s) executing this Agreement and the instruments referenced herein on behalf of Buyer have the legal power, right and actual authority to bind Buyer to the terms hereof and thereof. This Agreement is, and all other instruments, documents and agreements to be executed and delivered by Buyer in connection with this Agreement shall be, duly authorized, executed and delivered by Buyer and shall be valid, binding and enforceable obligations of Buyer.

**16.** <u>Notices</u>. Any and all notices, demands or requests required or permitted hereunder shall be in writing and shall be effective upon personal delivery or email or facsimile transmission or two (2) business days after being deposited in the U. S. Mail, registered or certified, return receipt requested, postage prepaid, or one (1) business day after being deposited with any commercial air courier or express service, addressed as follows:

|  |  |
|---|---|
| To Buyer: | ADB Investments, L.L.C.<br>Attn: David T. Reesor<br>11388 E. Appaloosa Place<br>Scottsdale, Arizona 85259<br>Email: davidreesor@photoadb.com |
|  | Francis J. Marotta<br>Marcor Commercial Real Estate Services<br>9383 E. Bahia Drive, Suite 150<br>Scottsdale, AZ 85260<br>Telephone: 480-607-9997<br>Email: fmarotta@marcorcre.com |
| with a copy to: | Engelman Berger, P.C.<br>Attn: Kurt A. Peterson<br>3636 N. Central Avenue, Suite 700<br>Phoenix, Arizona 85012<br>Telephone: 602-271-9090<br>Email: kap@eblawyers.com |
| To Seller: | Peoria Regional Medical Center, LLC<br>8020 E. Palm Lane<br>Mesa, Arizona 85207 |
| with a copy to: | Aiken Schenk<br>Attn: Heather A. Marce<br>2390 E. Camelback Road, Suite 400<br>Phoenix, Arizona 85016<br>Telephone: (602) 248-8203<br>Email: ham@aikenschenk.com |
| To Escrow Agent: | First Arizona Title Agency<br>Attn: Bill McCalmont<br>6263 N. Scottsdale Road, Suite 190<br>Scottsdale, Arizona 85250<br>Telephone: (480) 385-6520<br>Email: bill@firstaztitle.com |

Buyer, Seller or Escrow Agent may change its address for notice by giving notice of change of address in the manner provided above. The inability to deliver because of a changed address of which no notice was given, or rejection or other refusal to accept any notice, shall be deemed to be the receipt of the notice as of the date of such inability to deliver or rejection or refusal to accept. Any telephone numbers provided in this Agreement are for aiding informal

communications only and notices shall not be effective if only provided orally. An attorney for Buyer or Seller may give any notice hereunder on behalf of his client if such notice states that the attorney is giving notice on behalf of his client.

**17.**     Time of the Essence. Time is of the essence of this Agreement, and Buyer and Seller hereby agree to perform each and every obligation hereunder in a prompt and timely manner; provided, however, that if the date for the performance of any action or the giving of any notice which is required hereunder, occurs on a Saturday, Sunday or legal holiday, the date for performance or giving of notice shall be the next succeeding business day.

**18.**     Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be valid under applicable law, but if any provision of this Agreement shall be invalid or prohibited hereunder, such provision shall be ineffective to the extent of such prohibition or invalidation which shall not invalidate the remainder of such provision or the remaining provisions of this Agreement.

**19.**     Waiver. The waiver by either party hereto of any right granted to it hereunder shall not be deemed to be a waiver of any other right granted herein, nor shall same be deemed to be a waiver of a subsequent right obtained by reason of the continuation of any matter previously waived.

**20.**     Legal Fees. In the event it becomes necessary for either Seller or Buyer to employ legal counsel or to bring action at law or other proceeding to enforce any of the terms, covenants or conditions of this Agreement, the prevailing party in any such action or proceeding shall be entitled to recover its costs and expenses incurred, including its reasonable attorneys' fees, from the other party.

**21.**     Entire Agreement; Amendments. This Agreement contains the entire agreement of the parties hereto with respect to the matters covered hereby, and supersedes all prior agreements, arrangements and understandings between the parties, and no other agreement, statement or promise made by either party hereto that is not contained herein shall be binding or valid. This Agreement may be amended only by written document signed by each of the parties hereto.

**22.**     Counterparts; Electronic Signatures.   This Agreement may be executed simultaneously or in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement. Signatures transmitted by facsimile and emailed PDF signatures shall be valid as originals.

**23.**     Assignment. At any time prior to the Close of Escrow, Buyer may assign its right, title and interest in and to this Agreement. Upon the execution by any such assignee of a document whereby the assignee assumes Buyer's obligations hereunder, and Seller shall accept performance of all of Buyer's obligations from and after the assignment by the assignee.

**24.**     Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, devisees, personal and legal representatives, successors and assigns.

**25.**     Governing Law. This Agreement shall be construed and interpreted under, and

governed and enforced according to the laws of the State of Arizona. The parties hereto hereby submit to the jurisdiction of the courts of the State of Arizona in the event of any action or dispute arising from this Agreement.

**26.** Headings and Construction. The headings set forth in this Agreement are inserted only for convenience and are not in any way to be construed as part of this Agreement or a limitation on the scope of the particular section to which it refers. Where the context requires herein, the singular shall be construed as the plural, and neuter pronouns shall be construed as masculine and feminine pronouns, and vice versa. This Agreement shall be constructed according to its fair meaning and neither for nor against either party hereto.

**27.** Subsequent Acts. The terms and provisions of this Agreement shall not merge with, be extinguished by or otherwise be affected by any subsequent conveyance or instrument by or between the parties hereto unless such instrument shall specifically so state and be signed by the parties hereto.

**28.** Non-Foreign Person. Seller represents and warrants that it is not a "foreign person", as that term is defined in Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended (the "**Code**"). Prior to Close of Escrow, Seller shall furnish to Buyer and Escrow Agent Seller's United States taxpayer identification number and such affidavit and other information as Buyer or Escrow Agent may determine to be necessary or reasonable under Section 1445(b)(2) of the Code, or otherwise, to assure that Buyer shall not be subject to United States federal income tax withholding liability under Section 1445 of the Code. Seller shall in any event indemnify and hold harmless Buyer from and against any such cost, loss or liability that Buyer may incur under said Section 1445 of the Code.

**29.** No Assumption of Liabilities. Buyer is acquiring only the Property from Seller and is not the successor of Seller. Buyer does not assume or agree to pay, and shall not indemnify Seller or any other person against, any liability, obligation, or expense of Seller or relating in any way to the Property except to the extent, if any, expressly and specifically provided for in this Agreement.

**30.** Condemnation. If, prior to the Closing, all or any portion of the Property is taken by condemnation or eminent domain (or is the subject of a pending or contemplated taking which has not been consummated), Seller shall notify Buyer promptly upon Seller becoming aware of such fact. In such event, Buyer shall have the option to terminate this Agreement upon written notice to Seller given not later than five (5) days after receipt of such notice from Seller. Upon such termination, the Earnest Money shall be refunded to Buyer and the provisions of Section 6 shall apply. If Buyer does not timely elect, or has no right, to terminate this Agreement, Seller shall assign and turn over to Buyer, and Buyer shall be entitled to receive and keep, all awards for the taking by condemnation, and Buyer shall be deemed to have accepted the Property subject to the taking without reduction in the Purchase Price.

**31.** Damage or Destruction. Prior to the Closing and notwithstanding the pendency of this Agreement, the entire risk of loss or damage by flood or other casualty shall be borne and assumed by Seller. If, prior to the Closing, any Material Damage (as defined below) occurs to any portion of the Property as a result of any flood or other casualty, Seller shall immediately notify Buyer of such fact. In such event, Buyer shall have the option to terminate this Agreement upon written notice to Seller given not later than five (5) days after receipt of such

Case 2:17-bk-11742-SHG    Doc 78    Filed 07/17/18    Entered 07/17/18 07:51:49    Desc
Main Document    Page 27 of 38

notice from Seller. Upon such termination, the Earnest Money shall be refunded to Buyer and the provisions of <u>Section 6</u> shall apply. If Buyer does not elect to terminate this Agreement, Seller shall assign and turn over, and Buyer shall be entitled to receive and keep, all insurance proceeds payable with respect to such damage or destruction (which shall then be repaired or not at Buyer's option and cost) and the parties shall proceed to the Closing pursuant to the terms hereof without reduction in the Purchase Price. If Buyer does not elect to terminate this Agreement by reason of any casualty, Buyer shall have the right to participate in any adjustment of the insurance claim. As used herein, the term "**Material Damage**" shall mean damage or destruction the cost of repair of which exceeds Ten Thousand Dollars ($10,000.00).

     **32.**   <u>Waiver of Jury trial</u>. The parties hereby voluntarily, knowingly, irrevocably and unconditionally waive, to the fullest extent permitted by applicable law, any right to have a jury participate in resolving any dispute (whether based upon contract, tort or otherwise) between them arising out of or in any way related to this agreement or any other related document. No jury shall be empaneled for any dispute involving this agreement, including without limitation any advisory jury.

     **33.**   <u>OFAC Certification</u>. Buyer and Seller each represent and warrant to the other that: (a) it is not, and shall not become, a person or entity with whom the other party is restricted from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including, but not limited to, those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including, without limitation, the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended ["**Executive Order 13224**"]), or other governmental action and is not, and shall not, engage in any dealings or transactions or otherwise be associated with such persons or entities; and (b) it is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation with whom the other party is restricted from doing business under the regulations of OFAC (including, but not limited to, Executive Order 13224) or other governmental action and is not and shall not engage in any dealings or transactions, employ or otherwise be associated, with such person, group, entity or nation.

     **IN WITNESS WHEREOF**, Buyer and Seller have executed this Purchase and Sale Agreement as of the date first above-written.

                                   **ADB INVESTMENTS, L.L.C.,**
                                   an Arizona limited liability company

                                   By:    Brennan Management, Inc.,
                                          an Arizona corporation

                                   By:  _____
                                        David T. Reesor, President

**PEORIA REGIONAL MEDICAL CENTER,
LLC,** an Arizona limited liability company

By: _____
Timothy A. Johns, Manager

## ACCEPTANCE OF ESCROW AGENT

The undersigned Escrow Agent hereby (a) accepts the Escrow created by the foregoing Agreement, (b) agrees to act in accordance with the terms of this Agreement, (c) agrees to be the person responsible for closing the transaction within the meaning of Section 6045(e)(2)(A) of the Internal Revenue Code of 1986 (the "**Code**") and filing all necessary information reports, returns and statements (collectively, the "**Tax Reports**") regarding the transaction required by the Code and, promptly upon the filing of the Tax Reports, transmit copies of the Tax Reports to Buyer and Seller, (d) agrees to indemnify and hold harmless Seller, Buyer and their respective attorneys and brokers from and against all claims, costs, liabilities, penalties, or expenses resulting from Escrow Agent's failure to file the Tax Reports, (e) agrees to deliver to Buyer, within five (5) days after the Opening of Escrow, an insured closing protection letter from First American Title Insurance Company, and (f) confirms that the Opening of Escrow occurred on _____, 2018.

**FIRST ARIZONA TITLE AGENCY**

By: _____
      Bill McCalmont, Manager/Director

Case 2:17-bk-11742-SHG   Doc 78   Filed 07/17/18   Entered 07/17/18 07:51:49   Desc
Main Document    Page 30 of 38

## EXHIBIT A

### Legal Description of Property

Parcel No. 1:

Lot One (1), Peoria Regional Medical Center, according to Book 1099 of Maps, Page 44, records of Maricopa County, Arizona.

Parcel No. 2:

An easement for access, utilities and other uses as set forth in Permanent Irrevocable Exclusive Easement for Access (Inclusive of Street, Roadway and/or Pedestrian Improvements) and Utilities recorded December 9, 2004, at Recorder's No. 2004-1449231, official records of Maricopa County, Arizona.

{0005806.0000/00878343.DOCX / }

When Recorded Return To:

_____
_____
_____

## **SPECIAL WARRANTY DEED**

For good and valuable consideration received, **PEORIA REGIONAL MEDICAL CENTER, LLC,** an Arizona limited liability company ("**Grantor**"), does hereby grant and convey to **ADB INVESTMENTS, L.L.C.,** an Arizona limited liability company, all of Grantor's right, title and interest in and to the following described real property, and all improvements located thereon, situated in Maricopa County, Arizona:

See <u>Exhibit A</u> attached hereto and made a part hereof.

SUBJECT TO current real property taxes and other assessments; patent reservations; and all easements, rights of way, covenants, conditions, restrictions and other nonmonetary liens or encumbrances as may appear of record.

Grantor hereby binds itself and its successors to warrant and defend the title against all of the acts of Grantor and no other, subject to the matters above set forth.

DATED: _____, 2018.

**PEORIA REGIONAL MEDICAL CENTER, LLC,** an Arizona limited liability company

By: _____
Timothy A. Johns, Manager

STATE OF ARIZONA )
         ) ss.
County of Maricopa )

Acknowledged before me this ___ day of _____ 2018, by Timothy A. Johns, the Manager of Peoria Regional Medical Center, LLC, an Arizona limited liability company, for and on behalf of the company.

_____
Notary Seal/Stamp

_____
Notary Public

{0005806.0000/00878343.DOCX / }

## EXHIBIT C

## ASSIGNMENT AND BILL OF SALE

**THIS ASSIGNMENT AND BILL OF SALE** ("**Assignment**") is given as of the _____ day of _____, 2018, by **PEORIA REGIONAL MEDICAL CENTER, LLC**, an Arizona limited liability company ("**Assignor**"), for the benefit of **ADB INVESTMENTS, L.L.C.**, an Arizona limited liability company ("**Assignee**").

## RECITALS

     **A.**     Assignor and Assignee entered into that certain Purchase and Sale Agreement dated _____ ___, 2018 (the "**Agreement**"), whereby Assignor agreed to sell and Assignee agreed to purchase that certain real property located more particularly described on <u>Exhibit A</u> attached hereto and incorporated herein by this reference (the "**Property**").

     **B.**     In connection with the foregoing transaction, Assignor desires to transfer and assign to Assignee, on the terms and conditions set forth below, all of Assignor's right, title and interest, if any, in all rights, materials and/or claims relating to the Property or the use, entitlement or development thereof, including, without limitation: (i) all permits, licenses, applications, approvals, and any other authorizations issued by governmental entities or quasi-governmental entities; (ii) all entitlements, development agreements and other agreements relating to the entitlement and/or development of Property; (iii) all plats, plans, drawings, designs, engineering materials, studies, reports and other documents relating to any improvements to or serving the Property; (iv) all claims, awards and any similar rights relating to and benefiting the Property; (v) all water and sewer taps and hookup connections relating to the Property; (vi) all development rights benefiting the Property; (vii) any and all rights to receive any payments, impact fee credits or other credits, reimbursements, or refunds arising from any payments, dedications or any other actions taken by Assignor or any predecessor in title to the Property; (viii) any rights under any representations, warranties, and/or indemnities in Assignor's favor under any agreement and/or instrument by which Assignor acquired title to the Property; (ix) all rights to receive a reimbursement, credit or refund from the applicable agency or entity of any deposits or fees paid in connection with the development of the Property; and (x) all guarantees, warranties, indemnities and covenants under any and all contracts and agreements with contractors, subcontractors, suppliers and other persons and entities providing labor, services or materials in connection with the design, construction and installation of any improvements to or serving the Property (collectively, the "**Property Interests**").

     **NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby transfers and assigns to Assignee, without representation or warranty of any kind, all of Assignor's right, title and interest, if any, in and to the Property Interests. Assignee does not assume any duties or obligations of Assignor to be performed, paid or complied with under or with respect to any of the Property Interests, except as expressly provided in the Agreement. The parties agree to perform, execute and/or deliver or cause to be performed, executed, and/or delivered any and all such further acts, instruments and assurances as may be reasonably required to give effect the foregoing assignment.

{0005806.0000/00878343.DOCX / }
895038.1

**IN WITNESS WHEREOF**, this Assignment and Bill of Sale has been executed as of the date first above written.

**PEORIA REGIONAL MEDICAL CENTER, LLC,** an Arizona limited liability company

By: _____
Timothy A. Johns, Manager

{0005806.0000/00878343.DOCX / }
895038.1

**RIGHT OF FIRST OFFER
TO LEASE PROPERTY**

      **THIS RIGHT OF FIRST OFFER TO LEASE PROPERTY** is made this 13th day of July, 2018, by and between **ADB INVESTMENTS, L.L.C.**, an Arizona limited liability company ("**Owner**"), and **PEORIA REGIONAL MEDICAL CENTER, LLC**, an Arizona limited liability company ("**PRMC**").

**RECITALS:**

      **A.**     Owner and PRMC entered into that Purchase and Sale Agreement dated _____ __, 2018 (the "**Agreement**"), whereby Owner agreed to purchase that certain real property located more particularly described on Exhibit A attached hereto and incorporated herein by this reference (the "**Property**").

      **B.**     Owner contemplates constructing a regional medical center on the Property (the "**Hospital**").

      **C.**     In connection with the consummation of the purchase of the Property pursuant to the Agreement, Owner desires to grant to PRMC the one-time, non-transferable right of first offer (the "**ROFO**") to lease premises within the Hospital.

      **NOW, THEREFORE,** for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

**AGREEMENTS:**

      **1.**     If Owner desires to lease all or a portion of the Hospital (the "**Premises**") to an unaffiliated third party, then Owner shall first give PRMC written notice (the "**First Offer Notice**") specifying the price, terms and conditions upon which it is willing to lease the Premises. PRMC shall have thirty (30) days after receipt of the First Offer Notice within which to accept in writing the offer to lease the Premises (the "**Acceptance Notice**"). If PRMC gives Owner an Acceptance Notice, then the parties shall negotiate in good faith to agree upon the terms of a written lease, on Owner's form. Should Owner and PRMC fail to reach mutually acceptable terms and conditions of a Lease within sixty (60) days of such Acceptance Notice, then this First Offer Notice shall expire and become null and void and neither party shall have any further obligation to the other.

      The First Offer Notice is subject to Owner's review of the current financial condition of PRMC or any affiliate and any such First Offer Notice shall be subject to Owner's acceptance of the financial condition of PRMC, in Owner's sole and absolute discretion. If Owner does not approve of the financial condition of PRMC, then Owner may withdraw its First Offer Notice and upon such withdrawal this Right of First Offer shall become null and void and neither party shall have any further obligation to the other.

      If PRMC fails to give an Acceptance Notice, then Owner may lease all or a portion of the Premises to any third party on terms that are generally no more favorable than those contained in the First Offer Notice, and this Agreement and the ROFO shall thereafter be of no further force or effect.

      **2.**     The ROFO shall at all times be subordinate to the lien of any mortgage or deed of trust placed on the Property by Owner, and PRMC agrees to execute any document required by

Owner to confirm such subordination. This Agreement shall not be recorded.

   **3.**   This Agreement shall be binding only upon Owner, and not upon Owner's successors or assigns. This Agreement and the ROFO are personal to PRMC and may not be assigned or transferred.

   **4.**   The ROFO and all other rights and restrictions hereunder shall expire on the earlier to occur of (i) the date which is three (3) years following the date of this Agreement , and (ii) the date which is sixty (60) days following the date of substantial completion of the Hospital.

   **5.**   Any notice or other communication required or permitted hereunder shall be in writing and deemed effective (i) if personally delivered, on the day of delivery, (ii) if sent by United States certified or registered mail, postage prepaid, return receipt requested, on the second business day following the date of deposit in the United States mail, (iii) if sent by nationally-recognized overnight courier, specifying next-day delivery, on the next business day following the date of delivery to such overnight courier, or (iv) if sent by electronic mail transmission, on the date of transmission provided that a copy is also sent by one of the other delivery methods permitted hereunder, in each case addressed to the party for whom it is intended at the following addresses:

|  |  |
|---|---|
| If to Owner: | ADB Investments, L.L.C.<br>Attn: David T. Reesor<br>11388 E. Appaloosa Place<br>Scottsdale, Arizona 85259<br>Email: davidreesor@photoadb.com |
| | and |
| | Francis J. Marotta<br>Marcor Commercial Real Estate Services<br>9383 E. Bahia Drive, Suite 150<br>Scottsdale, AZ 85260<br>Email: fmarotta@marcorcre.com |
| with a copy to: | Kurt A. Peterson<br>Engelman Berger, P.C.<br>3636 N. Central Avenue, Suite 700<br>Phoenix, Arizona 85012<br>Email: kap@eblawyers.com |
| If to PRMC: | Peoria Regional Medical Center, LLC<br>8020 E. Palm Lane<br>Mesa, Arizona 85207 |
| with a copy to: | Aiken Schenk<br>Attn: Heather A. Macre<br>2390 E. Camelback Road, Suite 400<br>Phoenix, Arizona 85016<br>Email: ham@aikenschenk.com |

Provided, however, that any party may change its address for purposes of receipt of any such communication by giving ten (10) days' prior written notice of such change to the other parties in the manner prescribed above.

| If to PRMC: | Peoria Regional Medical Center, LLC |
| | 8020 E. Palm Lane |
| | Mesa, Arizona 85207 |
| | |
| with a copy to: | Aiken Schenk |
| | Attn: Heather A. Macre |
| | 2390 E. Camelback Road, Suite 400 |
| | Phoenix, Arizona 85016 |
| | Email: ham@aikenschenk.com |

Provided, however, that any party may change its address for purposes of receipt of any such communication by giving ten (10) days' prior written notice of such change to the other parties in the manner prescribed above.

      **6.**     This Agreement may be executed in counterparts (and by different parties to this Agreement in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. The parties may execute and exchange counterparts of the signature pages by facsimile transmission or by electronic mail in "portable document format" form, and when so exchanged, such signature pages and this Agreement shall be binding and effective for all purposes and treated in the same manner as if the parties had exchanged original, manually signed signature pages.

      **IN WITNESS WHEREOF**, Owner and PRMC have executed this Right of First Offer to Lease Property as of the date first above-written.

                           **ADB INVESTMENTS, L.L.C.,**
                           an Arizona limited liability company

                           By:     Brennan Management, Inc.,
                                      an Arizona corporation

                           By: _____
                                      David T. Reesor, President

                           **PEORIA REGIONAL MEDICAL CENTER,**
                           **LLC,** an Arizona limited liability company

                           By: _____
                                      Timothy A. Johns, Manager

{0005806.0000/00878343.DOCX / }
895038.1

**PEORIA REGIONAL MEDICAL CENTER, LLC,** an Arizona limited liability company

By: _____

Timothy A. Johns, Manager